UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14 CR 17 SNLJ (ACL) |
| | ) | |
| MARVIN LEON EASON, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>REPORT AND RECOMMENDATION</u>**

This matter was referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is the Defendant's

Motion to Suppress Evidence [Doc. 36] seized from his residence and Supplemental

Motion to Suppress with Request for a *Franks* Hearing [Doc. 43]. Eason argues that the

search warrant that was executed at his residence was not supported by probable cause,

further alleging that there was not a connection between his residence and the illegal

conduct that was being investigated. He also requested a *Franks* hearing based on a

claim that the search warrant affidavit contained intentional or reckless falsehoods.

Finally, Eason alleges that the executing officers violated Fed.R.Crim. Pro. 41 by failing

to give Eason a copy of the search warrant, failing to leave a copy of the inventory of

items seized, and not returning the original warrant to the Court. The Government filed

responses in opposition to Eason's claims. [Doc. 40, 46]

The Defendant also filed a Motion to Dismiss the Indictment [Doc. 37], to which

the Government filed a response [Doc. 39]. Eason claims that the Indictment was not

based upon competent evidence, rather it was based on hearsay and evidence that was seized pursuant to a faulty search warrant.

Following an evidentiary hearing [Doc. 47], both parties submitted memoranda. [Docs. 51, 52]

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, and the Criminal Docket Sheet[1] detailing the documents filed concerning the search warrant for Eason's residence (Case #1:13MJ4076), the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Suppress Evidence be denied.

## I. Findings of Fact

On May 29, 2013, DEA Task Force Officer Alan Nobles applied for a search warrant to search the residence of the Defendant, Marvin Eason. Officer Nobles prepared a fourteen page Affidavit (Gov't. Ex. #1) and attached it to an Application for Search Warrant [Doc. #1, Case #1:13MJ4076LMB], which was presented to United States Magistrate Judge Lewis M. Blanton.

The Affidavit explained that Officer Nobles was seeking a search warrant for a) Eason's residence, as well as b) a clothing business operated by Eason. The investigation regarding Eason and others, led Officer Nobles to believe that evidence of crimes involving the distribution of synthetic cannabinoids would be located at Eason's

---

[1]   The Docket Sheet was admitted into evidence at the request of the parties.

residence and a clothing business Eason operated with his father.[2]  While Eason also worked at a convenience store, no search warrant was sought for that location.[3]  Officer Nobles indicated that "[s]ynthetic cannabinoids are substances commonly referred to as "K-2", "spice", and "synthetic marijuana" that contain a chemical compound, which simulates the mental and physical effects of marijuana."  Officer Nobles relayed that synthetic marijuana has been deemed a controlled substance under the United States Code.

The contents of Officer Nobles' Affidavit detailed seven separate controlled purchases of K-2 that had been made from Eason with the assistance of a Confidential Source (CS).  Officer Nobles provided details for each of the controlled purchases.  *Three of the controlled purchases* occurred inside *a convenience store* where Eason worked (on October 17, October 26, and November 27, 2012); *two additional controlled purchases* occurred in the *parking lot of the convenience store* (on November 28, 2012 and May 1, 2013), *another controlled purchase* took place at a *car wash* (April 29, 2013), and the *final controlled purchase* happened in the *garage area of Eason's clothing business* (on May 20, 2013).  The Affidavit further noted that the CS reported that he observed Eason make a sale of K-2 to an individual while in the convenience store on October 17, 2012.

---

[2]  No evidence was seized as a result of the execution of the search warrant at the business.  Eason's motions do not challenge the search conducted at the business.

[3]  The Affidavit explained that a state search warrant had been executed at the convenience store on July 25, 2012, which resulted in the seizure of K-2 and shipping/ billing information.  In addition, the owners of the store were told to discontinue distributing K-2 and they agreed.

In addition to the locations of each of the purchases, Officer Nobles detailed the surveillance efforts that took place for each of the controlled purchases. A review of the Affidavit reveals that Eason either went to his residence, or was at his residence prior to engaging in three of the controlled purchases. The surveillance of those transactions is summarized below:

1.      On *October 17, 2012*, when the CS arrived to the convenience store to buy K-2, Eason left the convenience store, drove home, and then returned to the convenience store to make the sale to the CS.

2.      On *November 28, 2012*, the CS did not contact Eason until after he had left work. Eason got in his car at approximately 6:50 p.m. and at 7:07 p.m. the car was observed arriving at Eason's residence, although surveillance officers could not confirm that Eason was the person who got out of the car and went inside the residence. At roughly 7:41 p.m., a person was observed getting back into Eason's car and drove to the convenience store parking lot, arriving there at 7:43 p.m. Eason then exited his car and entered the CS' vehicle. At approximately 7:46 p.m., Eason exited the CS' vehicle, got in his vehicle, departed the parking lot, and arrived back at his home at around 7:48 p.m.

3.      On *May 1, 2013*, Eason had been working at the clothing business and surveillance officers observed him leave at 6:47 p.m.; they followed him to his residence. The CS later contacted Eason by phone and Eason instructed the CS to meet him at the convenience store. At 8:41 p.m., surveillance officers observed Eason exit his residence, get in his car, and then drive the car around to the

basement and park; Eason got out of the car, went inside the basement for a short period, and then drove to the convenience store parking lot, arriving there at around 8:52 p.m. Eason then got out of his car and walked up to the driver's side door of the CS' vehicle. After a few minutes, Eason left the CS and walked into the convenience store.

As far as the other four transactions are concerned, the information that was provided concerning where the K-2 came from for each of the sales is as follows: during the two other sales inside the convenience store, Eason pulled the K-2 from his pocket one time and a cardboard box on the floor the other time; during the sale at the car wash, Eason reached into his car for something before conducting the sale; and it is not clear where Eason had the K-2 before selling it to the CS, while in the garage of the clothing business.

During each of the seven aforementioned transactions between Eason and the CS, the CS paid Eason between forty and fifty dollars for quantities of what appeared to be K-2. The Honorable Lewis M. Blanton authorized the search warrant for Eason's residence on May 29, 2013 at 2:12 p.m. (Gov't. Ex. #2) After receiving the original signed search warrant, Officer Nobles made a copy for his file and gave the original to DEA Special Agent Homer Markhart.

The search warrant was executed on June 3, 2013 and numerous items were seized from Eason's residence. Shortly after the officers arrived at Eason's residence, DEA Special Agent Homer Markhart advised Eason of the reason for the search warrant; he also gave Eason the original copy of the warrant. Before the officers left Eason's

residence, a receipt listing the items seized (Gov't. Ex. #3) was given to Eason and the officers departed the residence.

The next day, June 4, 2013, the investigating officers determined that a number of items that had been seized should be returned to Eason. Those items included a Nike shoe, a Magellan GPS, and $1,130. Agent Markhart returned the items to Eason and Eason signed a receipt (Gov't. Ex. #3A), acknowledging that he received the items.

On June 5, 2013, when Officer Nobles was preparing to make the search warrant return to U.S. Magistrate Judge Blanton, the original search warrant could not be found. Officer Nobles communicated with Agent Markhart and learned that Agent Markhart had mistakenly given the original search warrant to Eason when the search warrant was executed. After making this discovery, Agent Markhart contacted Eason to see if Eason would exchange the original search warrant for copies of the search warrant. Eason advised Agent Markhart that he destroyed the search warrants he had been given to prevent his girlfriend from finding out about the searches. Instead of returning the original search warrant to Judge Blanton, Officer Nobles made the return with a copy of the Search Warrant and attached a typed list of the items seized. [Doc. #4, Case #1:13MJ4076LMB] He also submitted an Affidavit prepared by Agent Markhart. (Gov't. Ex. #4) That Affidavit provided an explanation as to what happened to the original copy of the search warrant. [Doc. #5, Case #1:13MJ4076LMB]

Eason testified that he was not shown or given a copy of the search warrant on June 3, 2013; he did not possess K-2, nor does he mess with drugs; he was never involved in selling K-2; he had no knowledge that any drugs were in his house; he did not

know about the gun in his house; and Agent Markhart did not contact him about recovering a copy of the original search warrant. Eason's testimony was not credible. Both Officer Nobles and Agent Markhart testified that when the officers first arrived with the search warrant, Eason was "very verbally combative" and claimed that the search warrant was not valid. Once Eason calmed down, Agent Markhart read the warrant to Eason. Quite a few officers were present when the search warrant was read. Officer Nobles was not in the same room as Eason and Agent Markhart when the warrant was read, but Officer Nobles could hear the warrant being read while in another room of the residence. When the search was complete, Agent Markhart left a receipt listing the items seized with Eason; another DEA Special Agent signed the receipt as a witness. Furthermore, law enforcement officers clearly documented that seven controlled purchases of K-2 were made from Eason. The undersigned rejects the testimony of Eason as being untruthful and accepts the testimony of the officers.

## II. Conclusions of Law

A. <u>Inaccurate Statements in Search Warrant Affidavit did not require *Franks* hearing.</u>

The Defendant challenges the validity of the search warrant under the rationale of *Franks v. Delaware*, 438 U.S. 154 (1978). In particular, Eason alleges that the second sentence of paragraph three of the Affidavit is intentionally false. [Doc. 43 at 2] The sentence in question, provided, "Additionally, during this time period EASON was seen providing customers with quantities of synthetic cannabinoids at locations other than hi[s] business; EASON was observed leaving his residence prior to each sale."

To succeed in a *Franks* type challenge to the validity of the search warrant, the Defendant must establish that the affiant either knowingly and willfully or with reckless disregard for the truth, included a false statement within the warrant affidavit. Mere negligence or innocent mistake is insufficient to void a warrant. *See Franks*, 438 U.S. at 156.

In *United States v. Stevens*, 530 F.3d 714 (8th Cir. 2008), the Court stated as follows in quoting the standard to be used in determining whether a statement is knowingly false or reckless: An affiant knowingly and intentionally or recklessly includes a false statement if he "in fact entertain[s] serious doubts as to the truth of the affidavit or ha[s] obvious reasons to doubt the accuracy of the information contained therein." *United States v. Clapp*, 46 F.3d 795, 801 (8th Cir. 1995) (adopting the First Amendment libel standard for *Franks* inquiries). Inaccurate statements that result from negligence or innocent mistake are insufficient to trigger relief under *Franks*. *See Franks*, 438 U.S. at 171; *Stevens*, 530 F.3d at 718.

The *Stevens* Court found that inaccurate statements in an affidavit about the defendant's criminal record did not reach the level of being knowingly false or reckless. The Court explained their conclusion as follows:

> We conclude that probable cause existed to issue the warrant to search Stevens's residence and that the district court did not clearly err in finding that the affiant officer did not knowingly or recklessly include a false statement in the affidavit...

> . . .

> With respect to the *Franks* challenge, we agree with the district court's conclusion that the affiant officer was at most negligent in including inaccurate information

regarding Stevens's criminal history in the affidavit. The affiant officer testified at the *Franks* hearing about the process he followed in preparing the affidavit, enabling the magistrate judge to assess his credibility. . .The magistrate judge found that the affiant officer had "hastily gathered" the information from multiple sources late at night. *See id*, (the synthesis of information from multiple sources may account for errors). We note that the information on Stevens's criminal history came from two states and the Federal Bureau of Investigation and that its complexity understandably resulted in the inaccuracies described above. . .

*Stevens*, 530 F.3d at 719-20.

Likewise, in *United States v. Clapp*, 46 F.3d 795 (8thCir. 1995), the district court determined that two inaccurate statements made by the affiant in the affidavit, although misleading and wrong, did not rise to the level of *Franks* violations. In so holding, the Court stated as follows:

Clapp argues that Tweedy's statement that he "participated" in an interview with Smith is false, since Tweedy only overheard portions of the interview while tending to other work across the room behind a five-foot partition. He also claims the statement that Smith "didn't know where the remaining $329,600.95 went" is directly contrary to information in the report DiPrima wrote on his interview with Smith. Tweedy's statement that he participated in the interview with Smith was misleading and inappropriate. Tweedy over-heard the interview from his desk fifteen to twenty feet away and was working on unrelated matters at the time. In addition, his statement that Smith did not know where the remaining money went was plainly inaccurate, since Smith told DiPrima that he received a check for the full $1, 250,000, which he en-dorsed, and that separate checks were then issued for $920, 399.05 in Smith's name and the balance in Clapp's name. All of this information was included in DiPrima's report on his interview with Smith.

Notwithstanding that Tweedy's statements were inaccurate, we do not believe that they were deliberate falsehoods or made with reckless disregard for the truth...

. . .

. . .Under this definition, neither Tweedy's statement about having participated in Smith's interview nor his failure to precisely report the details of Smith's interview with DiPrima constitutes reckless disregard for the truth; both, rather, evince negligent conduct. Tweedy's statement that he participated in the Smith interview was misleading and, thus, was negligent; it was not reckless, however. Similarly, his statement that Smith did not know where the remaining money went was more the product of carelessness than recklessness. Had Tweedy admitted to having read DiPrima's report yet nevertheless included in the affidavit that Smith did not know where the remaining money went, there might be grounds for concluding that Tweedy acted in reckless disregard for the truth. Tweedy, however, testified only that he thought the statement was made sometime during DiPrima's interview with Smith.

*Clapp*, 46 F.3d at 799-801.

Given the above law, the undersigned concludes that the sentence Eason challenges in the Affidavit was not intentionally false or recklessly made. The statement in the Affidavit alleged to be false or inaccurate is in substance that between October 27, 2012 and May 1, 2013 Eason sold "customers" synthetic marijuana at locations other than his business and that "Eason was observed leaving his residence prior to each sale." The sentence prior to the challenged sentence indicated that three of the controlled purchases occurred after Eason's posted business hours during the time frame in question—October 27, 2012 through May 20, 2013. It is important to note that Eason challenges a single sentence about the controlled purchases without adequate consideration of pages two through eleven of the Affidavit that offer specific details concerning each of the controlled purchases. Three of the sales did occur at times when Eason was not working, specifically, on:

1.     November 28, 2012:  this sale took place at approximately 7:46 p.m. in the parking lot of the convenience store—prior to the sale Eason left work, spent some time at home, and then met the CS at the parking lot to make the sale.

2.     May 1, 2013:  this sale took place at approximately 8:52 p.m.—earlier in the evening Eason had been working at the clothing business, but left at 6:47 p.m. and went home; Eason left his house at 8:41 p.m. to meet the CS at the convenience store parking lot.

3.     April 29, 2013:  this sale took place at 3:34 p.m.—shortly before 3:00 p.m., surveillance officers noticed that Eason's clothing business appeared to be closed, so the CS was instructed to call Eason to set up a purchase; Eason told the CS to meet him at a car wash, the CS arrived at the car wash, and Eason sold the CS a quantity of K-2.  In addition, the CS was concerned the use of K-2 would show up on a drug test, but Eason said it wouldn't and explained that he had been taking the test for the Feds for four years without any problems.

It is true that using the word "customers" was not accurate in that the CS is the person who made all seven controlled purchases.  On the other hand it is true that three of the seven sales occurred at non-business locations, in particular, the car wash and the parking lot of the convenience store.  The other inaccuracy in the challenged sentence is that it stated "Eason was observed leaving his residence prior to each sale," which was not true since the surveillance officers documented Eason leaving his residence prior to three of the sales as described in the Findings of Fact section.

Given the above, the undersigned concludes that there is no evidence that Officer Nobles included a false statement in his affidavit either knowingly and willfully or recklessly. It is clear that Eason made sales at locations other than the businesses where he worked and that he was at his residence prior to meeting the CS at specific locations for the purpose of selling K-2 on at least three occasions. There is no indication that there was any intent on the part of Officer Nobles to place a false statement in the Affidavit or that he recklessly did so. A substantial amount of information was being summarized in an introductory paragraph, which wasn't completely accurate. It is important that Officer Nobles did not rely on that short summary, but instead painstakingly described the details of all seven controlled purchases. There is no evidence that Officer Nobles was attempting to willfully or recklessly inform the magistrate judge that Eason had been to his residence prior to all seven sales, because the paragraphs that followed made it clear that was not the case. Officer Nobles' use of the phrase "Eason was observed leaving his residence prior to each sale," was at most negligent. In addition, the undersigned has observed the demeanor of Officer Nobles while testifying on the stand, and observed him to be forthcoming and candid in his responses to questions asked by Eason's attorney and the prosecutor. The undersigned concludes that Officer Nobles was a very credible witness, and that Officer Nobles believed that the Affidavit was truthful at the time he swore to it. Therefore, Eason's *Franks* challenge must fail.

Further, even if the information that "Eason was observed leaving his residence prior to each sale," is deleted from the Affidavit, the undersigned concludes that the

remaining facts support a reasonable probability that evidence of criminal activity would be found in the areas that were searched. The undersigned concludes that the adjusted Affidavit provides a substantial basis from which the issuing court could have determined probable cause.

B.     The search warrant was supported by probable cause.

Probable cause to issue a warrant exists when an affidavit sets forth sufficient facts to justify a prudent person in the belief that contraband will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Whether probable cause has been established involves the practical common sense evaluation of the totality of the circumstances. *Gates*, 462 U.S. at 238.

The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1979).

Probable cause is a "fluid concept turning on the assessment of probabilities in particular factual contexts--not readily or even usefully reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232. Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 632. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of

a crime will be found at the premises to be searched. *Gates, supra*. Also, affidavits should not be read in a hypertechnical manner. *See United States v. Ventresca*, 380 U.S. 102 (1965).

Given the above, the undersigned concludes that there was sufficient probable cause to search the premises of Eason's residence for any evidence related to the distribution of synthetic marijuana. The Affidavit revealed that over a period of seven months a CS purchased quantities of K-2 from Eason seven times at three separate locations. Prior to three of the seven sales, Eason was at his residence or stopped at his residence before meeting with the CS to sell K-2, so it is reasonable to conclude that Eason had the synthetic marijuana at his residence. During three other sales, the K-2 Eason sold to the CS was either in his pocket or in his vehicle. One of the sales involved Eason removing K-2 from a box located in the convenience store. Furthermore, Eason relayed that he personally did not have any trouble with his K-2 use showing up on drug tests, which would support that Eason not only sold K-2, but engaged in personal use of the drug. Such personal use is likely to have occurred at his residence. Finally, Officer Nobles included information in his Affidavit that based on his experience and training it is common for drug traffickers to make use of their residences to conceal and store proceeds from drug sales, records of drug transactions, and to conceal activities related to their drug trafficking. Given all of the above, the undersigned concludes that there was at least a "fair probability" that items relating to the distribution of synthetic marijuana would be found on the residential premises of Eason's home. Therefore, probable cause existed to search Eason's residence.

Eason also complains that the Affidavit did not provide any "information as to the reliability of the confidential source." [Doc. 52 at 3] "The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). Absent indicia of an informant's reliability, courts insist that search warrant affidavits contain substantial police corroboration, which "may be established by a police-monitored controlled buy…." *United States v. Hawkins*, 278 Fed.Appx. 629, 635 (8th Cir. 2008). *See also United States v. Neal*, 528 F.3d 1069, 1073-74 (8th Cir. 2008) (proven reliability of informant was supported by a single controlled buy from defendant and description of firearms informant observed in defendant's residence). Although Officer Nobles did not characterize the CS as a "reliable confidential informant," the information contained within the Affidavit established that the CS was reliable. The CS made multiple recorded phone calls to Eason to set up transactions, as directed by law enforcement officers, and successfully made seven separate controlled purchases of K-2 from Eason under the direction and surveillance of law enforcement officers.

C. Good Faith

Further, while evidence obtained as a result of a potentially defective search warrant is generally inadmissible, there is an exception for evidence found by officers relying in objective good faith on a defective search warrant. *See United States v. Leon*, 468 U.S. 897, 920, 921 (1984). There are four circumstances which exist in which the *Leon* good faith exception does not apply. They are as follows:

. . .(1) the magistrate judge issuing the warrant was misled by statements

made by the affiant that were false or made "in reckless disregard for the truth"; (2) " the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is "so facially deficient. . .that the executing officers cannot reasonably presume it to be valid."

*United States v. Guzman*, 507 F.3d 681, 685 (8th Cir. 2007). *See also Leon*, 468 U.S. 897 at 832.

Further, in *United States v. Grant*, 490 F.3d 627 (8th Cir. 2007), the Court stated as follows in dealing with the good faith exception:

Under the *Leon* good faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant. . . In assessing whether the officer relied in good faith on the validity of the warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit. . .and we confine our inquiry "to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization" .
. .

*United States v. Grant*, 490 F.3d 627, 633 (8thCir. 2007). *See also, United States v. Guzman, supra.*

Based on the above, the undersigned concludes that the totality of the circumstances support that it was objectively reasonable for the officers to rely on the warrant in this case and that they did so in good faith. First, the undersigned concludes pursuant to the analysis stated above in the section relating to the *Franks* challenge, the magistrate judge was not misled by any misstatements made by the affiant. Indeed, as stated above, Officer Nobles believed his Affidavit was truthful when he presented it to

the magistrate judge. As to whether or not the Affidavit was so lacking in indicia of probable cause or was so facially deficient that neither the executing officers nor the judge could believe it was valid, the undersigned concludes that the Affidavit was more than sufficient to meet the standard under *Leon* with or without the statement that "Eason was observed leaving his residence prior to each sale" being included in the Affidavit. As stated above, the Affidavit clearly established that Eason was at his residence immediately before three of the controlled purchases that were described. The fact that four other sales occurred without Eason going to his residence does not mean that evidence related to the sale of synthetic marijuana would not be found at Eason's residence. Considering the information contained in the entire Affidavit, both the officer and the judge could reasonably believe that such evidence could be found at Eason's residence. Further, the officer acted reasonably in attempting to obtain the warrant, and taking the necessary steps to present the warrant application to the magistrate judge. Therefore, the undersigned concludes that the Warrant and Affidavit were also sufficient under *Leon* standards.

>    D.   Defendant failed to demonstrate prejudice from alleged Rule 41 violations.

The next argument asserted by Eason is that the evidence seized from his residence should be suppressed based on alleged violations of Fed.R.Crim.P. 41. Eason claims that a) he was not given a copy of the search warrant, b) he was not given an inventory of the property that was taken, and c) Officer Nobles failed to return the original search warrant to the magistrate judge. [Doc. 52 at 7-8] In making this argument, Eason cites no authority for applying the exclusionary rule to procedural

violations of Rule 41, but instead argues that the alleged "procedural defects cannot be overlooked and amount to a deprivation of due process of the law." *Id*. at 8. Moreover, the undersigned has found no case that supports Eason's position that suppression is the appropriate remedy.

Eason is correct in noting that Rule 41(f)(1)(C) requires that "[t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken. . ." He is also correct in stating that Rule 41(f)(1)(D) requires that "[t]he officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant. The officer may do so by reliable electronic means." As pointed out by the Government, based on the fact the officer may make the return by "reliable electronic means," it is reasonable to conclude that the rule does not require return of the original search warrant. [Doc. 51 at 8]

The Second Circuit issued the first decision addressing when exclusion is required for non-compliance with Rule 41. *United States v. Burke*, 517 F.2d 377 (2d Cir. 1975). In *Burke*, the Second Circuit noted the existence of "relatively little case law on the question how far the failure of a warrant to conform to provisions of Rule 41 other than those concerned with the constitutional requirements of probable cause and particularity of description will trigger the exclusionary rule." *Burke*, 517 F.2d at 385. The Eighth Circuit relied on *Burke* in a case involving the admission of evidence that was seized under a search warrant issued to an individual lacking authority to apply for the warrant. The *Freeman* Court recited the conclusion in *Burke*:

> . . .in the absence of "an unconstitutional warrantless search, violations
> of Rule 41 alone should not lead to exclusion unless (1) there was "pre-
> judice" in the sense that the search might not have occurred or would
> not have been so abrasive if the Rule had been followed, or (2) there is
> evidence of intentional and deliberate disregard of a provision in the Rule."

*United States v. Freeman*, 897 F.2d 346, 349 (8th Cir. 1990) (quoting *Burke*, 517 F.2d at

386-87 (footnotes omitted in original)).  Freeman also noted that the "general refusal to

apply the exclusionary rule to violations of Rule 41 provisions, absent a constitutional

infirmity or showing of prejudice or reckless disregard, has been adopted by the Second,

Seventh, Ninth, Tenth, and Eleventh Circuits.  *Freeman*, 897 F.2d at 349 (citations

omitted).  *See also United States v. Adams*, 401 F.3d 886, 893 (8th Cir. 2005) (prejudice

not proven where officers failed to provide comprehensive inventory of evidence seized

during search of defendant's residence); *United States v. Nichols*, 344 F.3d 793, 799 (8th

Cir. 2003) (even where search warrant inventory list is deficient, defendant cannot

demonstrate prejudice and suppression is not required); and *United States v. Sigillito*, 759

F.3d 913, 925 (8th Cir. 2014) (failure to leave attachment to the search warrant at the

scene did not warrant exclusion).

First, this Court has found that officers did comply with the requirements of both

Rule 41(f)(1)(C), because Eason was given the original copy of the search warrant, as

well as an inventory of the items seized.

In regard to Eason's assertion that Officer Nobles' failure to return the original

copy of the search warrant requires suppression, Eason has not asserted any prejudice

resulting from that failure, nor does he assert that there was an intentional and deliberate

disregard of the provision requiring that the warrant be returned. The record demonstrates that Officer Nobles was very conscientious about the requirements of Rule 41(f)(1)(D) and when he discovered the original had mistakenly been given to Eason, rather than a copy, an effort was made to recover the original; when that effort failed a copy of the warrant and an Affidavit explaining the unavailability of the original were provided to the magistrate judge. Finally, the provision in Rule 41(f)(1)(D) that allows for the return to be accomplished by "reliable electronic means," adds support for the conclusion that there was no prejudice or reckless disregard for proper procedure by virtue of Officer Nobles returning a copy of the search warrant to the judge rather than the original.

E. <u>The Motion to Dismiss</u>

Eason also filed a Motion to Dismiss the Indictment alleging that it was not supported by adequate evidence. He claims that the evidence used to secure the Indictment was based on hearsay and evidence that was illegally seized pursuant to a faulty search warrant. [Doc. 37 at 1]

"As a general rule, an indictment is sufficient if it 'first, contains the essential elements of the charged offense and fairly informs a defendant of the charges against which he must defend, and second, enables him to plead double jeopardy as a bar to a future prosecution." *United States v. Just*, 74 F.3d 902, 903 (8th Cir. 1996) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). *See United States v. Pemberton*, 121 F.3d 1157, 1169 (8th Cir. 1997) (holding to same effect). The Indictment in the instant case is a plain, concise, and definite statement of the essential facts constituting the

offenses charged and complies in all respects with Rule 7(c) of the Federal Rules of

Criminal Procedure.  Moreover, the Indictment closely tracks the language of the

underlying statutes and, therefore, is legally sufficient.  *See United States v. Oakie*, 12

F.3d 1436, 1440 (8th Cir. 1993).  *See also United States v. Pennington*, 168 F.3d 1060,

1064 (8th Cir. 1999) (rejecting as meritless sufficiency challenge to indictment that,

although it alleged offense recognized by law, did not cite statute and did not use exact

words in statute; language in indictment was sufficient to apprise defendant of charges

and to allow him to prepare effectively for trial).

　　Additionally, "a pretrial motion to dismiss an indictment is not a permissible

vehicle for addressing the sufficiency of the government's evidence."  *United States v.

DeLaurentis*, 230 F.3d 659, 660 (3rd Cir. 2000) (alteration added) (holding that Fed. R.

Crim. P. 12(b)(2) authorizes dismissal of an indictment on the grounds that its allegations

are not sufficient to charge an offense but not on the grounds that the evidence is not

sufficient to prove the charges).

> "In civil cases, of course, the summary judgment procedures contemplated
> by Federal Rule of Civil Procedure 56 may be utilized to test, pretrial, the
> sufficiency of the evidence to establish triable issues of fact; but there is no
> corollary in criminal cases.  The government is entitled to marshal and
> present its evidence at trial, and have its sufficiency tested by a motion for
> acquittal pursuant to Federal Rule of Criminal Procedure 29 . . . [W]e
> simply cannot approve dismissal of an indictment on the basis of
> predictions as to what the trial evidence will be."

*United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *DeLaurentis*,

230 F.3d at 661) (alterations in original).

Defendant also argues that there was insufficient competent evidence presented to the grand jury. "It has long been settled that an indictment is not open to challenge on the ground that there was insufficient evidence before the grand jury." *United States v. Nelson*, 165 F.3d 1180, 1182 (8th Cir. 1999) (citing Costello v. United States, 350 U.S. 359, 363-64 (1956)). *See also Costello*, 350 U.S. at 363 ("An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for a trial of the charge on its merits. The Fifth Amendment requires nothing more.").

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence [Doc. 36] and Supplemental Motion with Request for a *Franks* Hearing [Doc. 43] be **denied**.

**IT IS FURTHER RECOMMENDED** that the Defendant's Motion to Dismiss Indictment [Doc. 37] be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of October, 2014.